In The

# United States Court Of Appeals
## For The Fourth Circuit

**ITMANN COAL COMPANY,**

*Petitioner,*

v.

**DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR;
ZED JEFFERSON THORNTON,**
executor of Shirley Ann Thornton's estate

*Respondents.*

ON APPEAL FROM THE BENEFITS REVIEW BOARD
BRB-1 : 23-0283 BLA

———————

### BRIEF OF PETITIONER

———————

John R. Sigmond
PENN, STUART & ESKRIDGE
804 Anderson Street
Bristol, TN 37620
(423) 793-4803
jsigmond@pennstuart.com

*Counsel for Petitioner*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1738__     Caption: __Itmann Coal Company v DOWCP; Shirley Ann Thornton, widow__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Itmann Coal Company__
(name of party/amicus)

_____

who is _____Appellant/Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      CONSOL ENERGY, INC.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑ YES ☐ NO
      If yes, identify all such owners:
      CONSOL ENERGY, INC.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ John R. Sigmond _____     Date: _____8/16/2024_____

Counsel for: Itmann Coal Company _____

- 2 -

[Print to PDF for Filing]

# **TABLE OF CONTENTS**

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ......................................................................... iii

I. STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ................................................................................1

II. STATEMENT OF THE ISSUES ................................................................2

III. STATEMENT OF THE CASE/ STATEMENT OF FACTS........................3

IV. SUMMARY OF ARGUMENT..................................................................19

V. ARGUMENT.............................................................................................21

    A. STANDARD OF REVIEW ...............................................................21

    B. THE ALJ'S FINDING THAT CLAIMANT ESTABLISHED TOTAL DISABILITY BY A PREPONDERANCE OF THE EVIDENCE IS NOT IN ACCORDANCE WITH THE LAW OR SUPPORTED BY SUBSTANTIAL EVIDENCE. .....................22

        1. THE ALJ'S DECISION TO CREDIT THE MAY 8, 2012 PULMONARY FUNCTION STUDY AS BEING RELIABLE AND SUPPORTIVE OF A FINDING OF TOTAL DISABILITY IS NOT IN ACCORDANCE WITH THE LAW OR SUPPORTED BY SUBSTANTIAL EVIDENCE..................................................................................23

        2. THE ALJ'S DECISION TO CREDIT THE MEDICAL OPINION EVIDENCE AS SUPPORTING A FIDNING OF TOTAL DISABILITY IS NOT IN ACCORDANCE WITH THE LAW OR SUPPORTED BY SUBSTANTIAL EVIDENCE..................................................................................41

i

C.    THE ALJ's FINDING THAT CLAIMANT ESTABLISHED ENTITLEMENT TO THE REBUTTABLE PRESUMPSIONS OF PNEUMOCONIOSIS AND DEATH CAUSATION IS NOT IN ACCORDANCE WITH THE LAW OR SUPPORTED BY SUBSTANTIAL EVIDENCE............................................................42

VI.    CONCLUSION.................................................................44

VII.    REQUEST FOR ORAL ARGUMENT............................................45

VIII.    CERTIFICATE OF COMPLIANCE ............................................46

IX.    CERTIFICATE OF SERVICE...................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Consol. Edison Co. of N.Y. v. NLRB,*
    305 U.S. 197 (1938)..................................................................21

*Cooley v. Island Creek Coal Co.,*
    845 F.2d 622 (6th Cir. 1988) ....................................................23

*Harman Mining Co. v. DOWCP,*
    678 F.3d 305 (4th Cir. 2012) ....................................................21

*Island Creek Coal Co. v. Blankenship,*
    ___ F.4th ___, 2024 WL 5131109.............................................43

*Milburn Colliery Co. v. Hicks,*
    138 F.3d 524 (4th Cir. 1998) ....................................................21

*Peabody Coal Co. v. Helms,*
    901 F.2d 571 (7th Cir. 1990) ....................................................17

*Sea "B" Mining Co. v. Addison,*
    831 F.3d 244 (4th Cir. 2016) ....................................21, 22, 40, 41

*Sterling Smokeless Coal Co. v. Akers,*
    131 F.3d 438 (4th Cir. 1997) ....................................................21

*Toler v. Eastern Assoc. Coal Co.,*
    43 F.3d 109 (4th Cir. 1995) ........................................................6

*West Virginia CWP Fund v. Bender,*
    782 F.3d 129 (4th Cir. 2015) ....................................................43

*West Virginia CWP Fund v. Smith,*
    880 F.3d 691 (4th Cir. 2018) ....................................................42

**Statutes**

Administrative Procedure Act

    5 U.S.C. § 557(c)(3)(A) ................................................................22

Black Lung Benefits Act

    30 U.S.C. § 901 ...........................................................................1

    30 U.S.C. § 921(c)(4) ..............................................4, 20, 29, 42

    30 U.S.C. § 932(a) ...........................................................1, 3, 22

Longshore Act

    33 U.S.C. § 921(c) .......................................................................1

Federal Coal Mine Health and Safety Act of 1969 Title IV ................................1, 33

**Regulations**

Black Lung Regulations

20 C.F.R. § 718.101 .......................................................................24

20 C.F.R. § 718.101(b) .......................................................23, 24, 31

20 C.F.R. § 718.103 .............................................24, 25, 26, 31, 32

20 C.F.R. § 718.103(a) .................................................................27

20 C.F.R. § 718.103(b) ...........................................................27, 32

20 C.F.R. § 718.103(c) .................................................................31

20 C.F.R. § 718.201 .......................................................................43

20 C.F.R. § 718.202(b)(2)(i)(A)-(C) ..............................................6

20 C.F.R. § 718.204(a) ...................................................................23

20 C.F.R. § 718.204(b)(1)................................................................22

20 C.F.R. §718.204(b)(2)(i)..........................................................5, 29

20 C.F.R § 718.204(b)(2)(i)-(iv)......................................................23

20 C.F.R. § 718.204(b)(2)(i)(A)-(C).................................................28

20 C.F.R. §718.204(b)(2)(iv)............................................................5

20 C.F.R. § 718.205(a)....................................................................22

20 C.F.R. § 718.304........................................................................22

20 C.F.R. § 718.305....................................................................4, 42

20 C.F.R. § 718.305(d)(2)(i)...........................................................42

20 C.F.R. § 718.305(b)(iii)..............................................................22

20 C.F.R. §718.305(d)(1)................................................................43

20 C.F.R. § 725.103........................................................................22

20 C.F.R § 725.202(d)(2)(iii)...........................................................23

20 C.F.R § 725.203(a)(2).................................................................23

20 C.F.R. § 725.212(a)....................................................................22

20 C.F.R § 725.310.........................................................................23

20 CFR part 718.............................................................................24

20 CFR part 725........................................................................24, 25

20 CFR Part 727........................................................................24, 25

Appendix B to Part 718.............................6, 27, 30, 31, 33, 39

Appendix C to Part 718....................................................................6

Secretary's Comments to the Regulations

64 Fed Reg. 54,975 (Oct. 8, 1999)....................................................24, 25

65 Fed. Reg. 79,928 (Dec. 20, 2000)......................................................24

65 Fed. Reg. 80052 Part 718.................................................6, 30, 33, 39

**Other References**

Cleveland Clinic, Lingula
https://my.clevelandclinic.org/health/body/8960-lungs
(last visited January 6, 2025).............................................................7

Cleveland Clinic, CT Computed Tomography Scan
https://my.clevelandclinic.org/health/diagnostics/4808-ct-computed-tomography-scan
(last visited January 6, 2025).............................................................7

Cleveland Clinic, Anasarca
https://my.clevelandclinic.org/health/diseases/anasarca
(last visited January 6, 2025)...........................................................15

Cleveland Clinic, Hyperkalemia High Blood Potassium
https://my.clevelandclinic.org/health/diseases/15184-hyperkalemia-high-blood-potassium
(last visited January 6, 2025).............................................................8

Cleveland Clinic, Pleural Effusion
https://my.clevelandclinic.org/health/diseases/17373-pleural-effusion
(last visited January 6, 2025)...........................................................11

Cleveland Clinic, Neutropenia
https://my.clevelandclinic.org/health/diseases/21058-neutropenia
(last visited January 6, 2025)...........................................................12

Cleveland Clinic, Thoracentesis
https://my.clevelandclinic.org/health/treatments/24254-thoracentesis
(last visited January 6, 2025)...........................................................11

Cleveland Clinic, Bronchitis
https://my.clevelandclinic.org/health/diseases/3993-bronchitis
(last visited January 6, 2025)..........................................................................13

Cleveland Clinic, Leukemia
https://my.clevelandclinic.org/health/diseases/4365-leukemia
(last visited January 6, 2025)..........................................................................15

Cleveland Clinic, Polycystic Kidney Disease
https://my.clevelandclinic.org/health/diseases/5791-polycystic-kidney-disease
(last visited January 6, 2025)............................................................................3

Cleveland Clinic, Multiple Myeloma
https://my.clevelandclinic.org/health/diseases/6178-multiple-myeloma
(last visited January 6, 2025)............................................................................9

Cleveland Clinic, Myelodysplastic Syndrome Myelodysplasia
https://my.clevelandclinic.org/health/diseases/6192-myelodysplastic-syndrome-myelodysplasia
(last visited January 6, 2025)..........................................................................12

WebMD, Lung Granulomas
https://www.webmd.com/lung/lung-granulomas
(last visited January 6, 2025)..........................................................................11

# I. STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This appeal arises from a Decision and Order issued by the Benefits Review Board ("Board"), United States Department of Labor, under Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. § 901, et seq. (the "Act"). This Court has jurisdiction to review the Board's Decision pursuant to 33 U.S.C. § 921(c), as incorporated by 30 U.S.C. § 932(a).

On June 10, 2024, the Board issued a Decision and Order affirming Administrative Law Judge Dana Rosen's Decision and Order Awarding Benefits on Remand. JA3. Employer timely filed a Petition for Review with the United States Court of Appeals for the Fourth Circuit on August 8, 2024, or within 60 days of the Board's Decision.

Mr. Barry Thornton last worked as a coal miner in West Virginia, which is within the jurisdiction of the Fourth Circuit. JA5, JA62. The facts establish the Court's appellate and subject matter jurisdiction.

## II. <u>STATEMENT OF THE ISSUES</u>

A.  WHETHER THE ALJ'S FINDING THAT CLAIMANT ESTABLISHED TOTAL DISABILITY BY A PREPONDERANCE OF THE EVIDENCE IS IN ACCORDANCE WITH THE LAW AND SUPPORTED BY SUBSTANTIALEVIDENCE.

B.  WHETHER THE ALJ's FINDING THAT CLAIMANT ESTABLISHED ENTITLEMENT TO THE REBUTTABLE PRESUMPSIONS OF PNEUMOCONIOSIS AND DEATH CAUSATION IS IN ACCORDANCE WITH THE LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE.

## III.   **STATEMENT OF THE CASE/STATEMENT OF FACTS**

Barry Lee Thornton ("Thornton" or "miner") went to work in the coal mining industry in 1965. JA110, JA679, JA682. He worked underground as an electrician until he left the industry in 1987. JA104-JA105, JA682, JA684. He then worked as a mechanic at a company that made hydraulics until 2000 when he retired. JA681, JA686. Thorton filed a claim for federal black lung benefits in 1995. JA698. However, the claim was denied. Id.

Thornton passed away on March 21, 2014. JA692, JA671. The death certificate, completed by Thornton's treating oncologist, lists the cause of death as Myelodysplasia/Acute Myeloid Leukemia. JA671. No other causes are listed. Id. Thornton's medical records from the final years of his life indicate that he treated for prostate cancer, diabetes mellitus, polycystic kidney disease[1] with renal failure, and cirrhosis. JA908. They also note that Thornton's mother and two of his siblings died of cancer. JA908, JA975. Finally, Thornton smoked approximately one pack of cigarettes per day for 35 years, quitting in 1995. JA65.

Mr. Thornton's widow, Shirley Thornton ("Claimant"), filed a survivor's claim for benefits on August 11, 2017. JA692. Following a preliminary award by the

---

[1.] Polycystic kidney disease (PKD) is a genetic disorder that causes cysts to grow in the kidneys. Health complications include high blood pressure and kidney failure. Most people with PKD will eventually need dialysis or a kidney transplant. PKD affects about 500,000 people in the U.S. *See https://my.clevelandclinic.org/health /diseases/5791-polycystic-kidney-disease.*

Department of Labor, the claim was heard by Administrative Law Judge ("ALJ" or "Judge") Dana Rosen on June 10, 2021. JA562, JA194. On February 3, 2021, ALJ Rosen issued a Decision and Order Awarding Survivor's Benefits. JA60. In her Decision, the ALJ credited Thornton with 21.25 years of qualifying coal mine employment and proceeded to determine whether Claimant had proven Thornton suffered from a totally disabling respiratory or pulmonary impairment. JA78, JA79. The ALJ found Claimant failed to prove total disability pursuant to the arterial blood gas evidence, and correctly noted that the record included no evidence of pulmonary massive fibrosis or cor pulmonale. JA79-80. However, ALJ Rosen found the pulmonary function study and medical opinion evidence supported a finding of total disability. JA80-82. She then found Claimant eligible to benefit from the rebuttable presumption of death due to pneumoconiosis (30 U.S.C. § 921(c)(4), as incorporated by 20 C.F.R. § 718.305), and proceeded to consider whether Employer rebutted the presumption. JA82. Judge Rosen found Employer failed to rebut the presumptions of legal pneumoconiosis and death causation. JA85-88. Accordingly, the ALJ awarded Claimant's claim for survivor's benefits. JA88.

Employer appealed, and on January 23, 2023, the Benefits Review Board issued a Decision and Order affirming in part, vacating in part, ALJ Rosen's Decision. JA1005. Specifically, the Board stated:

> On remand, the ALJ must reconsider whether the May 8,
> 2012 pulmonary function study is sufficiently reliable to

support a finding of total disability. In addressing this issue, she must address all relevant evidence and resolve any conflicts in the evidence, explaining the weight she accords the opinions of Drs. Rosenberg and Fino. She must then weigh the pulmonary study evidence to determine if Claimant is able to establish total disability at 20 C.F.R. §718.204(b)(2)(i). The ALJ must also reconsider the medical opinion evidence at 20 C.F.R. §718.204(b)(2)(iv). She must further weigh all the evidence together and determine whether Claimant has established total disability and invoked the Section 411(c)(4) presumption.

JA1009-1010.

On March 30, 2023, ALJ Rosen issued a Decision and Order on Remand Awarding Benefits. JA40. Judge Rosen found the May 8, 2012 PFT reliable evidence to support a finding of total disability because Dr. Gallup did not state the study was unreliable. JA45. The ALJ stated she credited Dr. Gallup's opinion over the contrary opinions of Drs. Fino and Rosenberg when considering the reliability of the May 8, 2012 PFT because Dr. Gallup was a treating physician and because Drs. Fino and Rosenberg failed to explain their opinions as to the reliability of the May 8, 2012 PFT. Id. The ALJ chose to credit Dr. Gallup's medical opinion on total disability, and discredit the opinions of Drs. Fino and Rosenberg, for the same reasons. JA45. Finally, the ALJ discredited Drs. Fino and Rosenberg's opinions on pneumoconiosis and death causation because she discredited their opinions on total disability. JA52. Thus, the ALJ found Employer failed to rebut the presumption of death due to pneumoconiosis and awarded benefits. JA53, JA54.

Employer appealed, but on June 10, 2024, the Board issued a Decision and Order affirming the ALJ's award of benefits. JA3. This appeal followed.

***Relevant Medical Evidence of Record***

PULMONARY FUNCTION STUDIES

| Date | EXH | Phys. | Age / HT | FEV1 | MVV | FVC | FEV1 /FVC | Disability Standard[2] | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | FEV1 | MVV | FVC |
| 12/19/ 1995 | JA699 | Stringer | 55/71 | 3.14 3.38 | 116 146 | 4.64 4.99 | 67 67 | 2.23 | 150 | 2.83 |
| 09/16/ 2003 | JA663 | Gallup | 63/71 | 2.60 | -- | 3.44 | 76 | 2.10 | 84 | 2.69 |
| 05/08/ 2012[3] | JA662 | Gallup | 71/71 | 1.26 | -- | 1.98 | 64 | 1.98 | 79 | 2.55 |

ARTERIAL BLOOD GAS STUDIES

| Date | Exhibit | Physician | PCO$_2$ | PO$_2$ | Altitude | PO$_2$ Disability Standard[4] |
|---|---|---|---|---|---|---|
| 12/19/1995 | JA700 | Stringer | 38 34 | 84 106 | 0-2999 | 62 66 |

---

[2.] The average of the measured heights from the PFTs of record is 71.0 inches. *See Toler v. Eastern Assoc. Coal Co.*, 43 F.3d 109, 114 (4th Cir. 1995). Therefore, the FEV1 disability standards set forth above are for an individual of Thornton's age at the time of the test who was 71.3 inches tall. *See* Appendix B to 20 C.F.R. Part 718, 65 Fed. Reg. 80052.

[3.] The May 8, 2012 PFT is non-qualifying. For a PFT to be qualifying, in addition to the FEV1 meeting disability standards, one must also show that either the FVC or MVV values meet disability standards, or that the FEV1/FVC value is 55 or below. *See* 20 C.F.R. § 718.202(b)(2)(i)(A)-(C); Appendix B to 20 C.F.R. Part 718, 65 Fed. Reg. 80052. In this case, although the FEV1 value meets disability standards, the FVC and FEV1/FVC values do not, and no MVV was administered.

[4.] The disability standards for arterial blood gas studies are found in Appendix C to 20 C.F.R. Part 718.

The record includes a September 16, 2003 new patient note from Dr. Kenneth Gallup of Salem Chest Specialists, which notes Thornton had been referred for evaluation of a lingular[5] lung lesion. JA665. The note indicates Thornton presented to his primary care physician with complaints of high-grade fever, chills, vomiting and shortness of breath, and a chest x-ray administered on August 28, 2003, revealed a questionable small lingular mass vs. infiltrate. Id. Thornton underwent a CT scan[6] of the chest that same day, which confirmed the presence of a lesion. JA665, JA664. The differential diagnosis was infection vs. neoplasm. Id. Dr. Gallup noted that a pulmonary function study administered on the day of his exam was normal and a chest x-ray confirmed the lesion had resolved. JA666. The doctor noted in the "Plan" section of his report that Thornton did not require further treatment, aside from a repeat chest CT in one year to check on the bilateral subpleural nodules. Id. He was released to return on an as needed ("prn") basis. Id.

Dr. Gallup's note indicated that Thornton had a history of diabetes, hypertension and gout, and had undergone heart catheterization three years earlier. JA665. The note also indicated he had exhibited irregularities on his chest x-ray and

---

[5.] The lingula is an extension of the superior lobe of the left lung. *See https://my.clevelandclinic.org/health/body/8960-lungs.*

[6] A CT (computed tomography) scan is an imaging test that helps healthcare providers detect diseases and injuries. It uses a series of X-rays and a computer to create detailed images of your bones and soft tissues. *See https://my.clevelandclinic.org/health/diagnostics/4808-ct-computed-tomography-scan.*

had received a state award for silicosis. Id. He did not have a history of cough, but did complain of shortness of breath with modest activity. Id.

The next record in evidence is a February 16, 2011 letter from Dr. Douglas Stewart of Nephrology Associates to Dr. Christopher Thomas of Novant Health Oncology. JA903. Dr. Stewart noted Thornton had been referred to him on November 23, 2010 for chronic renal failure, proteinuria, and elevated blood pressures in the presence of a 15-year history of type 2 diabetes mellitus. Id. An ultrasound suggested underlying polycystic kidney disease. Id. The doctor noted Thornton continued to exhibit hyperkalemia[7] despite normal test results, and he was concerned about an underlying malignancy. Id.

Notes from Novant Health Oncology begin with Thornton's initial visit on February 24, 2011. JA907. The doctor noted that Thornton reported feeling "extremely exhausted mainly over the last 8-10 years, worse over the last couple of months. He walks approximately a 100 feet and wears out." Id. The doctor further noted "Shortness of breath is at baseline, but worse with exertion." Id. Thornton's list of medications did not include breathing medications, and the past medical history was positive for silicosis and noted continuing treatment for prostate cancer.

---

[7.] Hyperkalemia is a condition in which the potassium levels in one's blood are too high. The most common cause of hyperkalemia is kidney disease. *See https://my.clevelandclinic.org/health/diseases/15184-hyperkalemia-high-blood-potassium.*

JA907-908. There was no mention of COPD, emphysema, chronic bronchitis or asthma. JA909. Dr. Thomas recommended a CT scan, which Thornton underwent the following day. JA909, JA911.

Thornton returned to Dr. Thomas on March 3, 2011 for a follow-up. JA913. Dr. Thomas noted that the CT revealed numerous cysts throughout both kidneys suggesting polycystic kidney disease. Id. The doctor recommended a bone marrow biopsy because the CT showed no acute malignancies that would account for his hypercalcemia. JA914-915. The biopsy was performed in the office that day. Id.

Thornton was next seen by Dr. Stewart at Nephrology Associates on March 24, 2011. JA918. The doctor noted that the bone marrow biopsy revealed multiple myeloma,[8] and that Dr. Thomas recommended treating with erythropoietin for his anemia, which has been associated with significant weakness and poor exercise tolerance. Id. The recorded medications include no breathing medications, and the past medical history was updated to note "reported silicosis." JA918, JA919.

Thornton returned to Dr. Stewart on September 26, 2011. JA921. It was noted that Thornton was four months overdue for his appointment. Id. The doctor noted Thornton had refused chemotherapy for treating his malignancy but was not adverse

---

[8.] Multiple myeloma is a rare blood cancer that affects one's plasma cells. Multiple myeloma can start a cascade of medical issues and conditions that can affect one's bones, one's kidneys and the body's ability to make healthy white and red blood cells and platelets. *See* *https://my.clevelandclinic.org/health/diseases/6178-multiple-myeloma.*

to dialytic therapy. Id. Subsequent notes from Dr. Stewart dated November 28, 2011 and February 29, 2012 indicated that Thornton had stopped seeing Dr. Thomas for his Myeloma and Dr. Hart for his prostate cancer, and that he did not wish to be referred to other physicians for treatment of those conditions. JA924, JA927. Dr. Stewart noted that Thornton understood those diseases would be fatal. JA924, JA927.

Next, Thornton was seen at Walkertown Family Practice for a follow-up for pneumonia on May 1, 2012. JA930. It appears Thornton had been seen on April 24, 2012, although the report is not in the record. Id. The attending physician's assistant ("PA") noted that Thornton reported that his legs had been swelling, and it appears the PA associated this with his refusal of treatment for multiple myeloma. JA930. The PA noted Thornton was "still coughing," but also noted "lungs sound clear, really no wheezes, rales, or rhonchi." Id. The assessment was anemia, pneumonia, and increasing shortness of breath. Id. It was noted that Dr. Schaeffer wanted to schedule Thornton for visit with a pulmonologist to see if there was fluid on his lungs that could be drawn off. Id.

Thornton was next seen by Dr. Gallup and Salem Chest Specialists on May 8, 2012. JA658. Dr. Gallup noted Thornton had been referred for complaints of shortness of breath that had been going on for "a couple of weeks." Id. The doctor noted Thornton had originally been seen in September of 2003 for a suspected

lingular lung mass. Id. He noted that he had been sent on this occasion to see if there

was enough fluid on his lungs to undergo thoracentesis.[9] Id. The doctor's assessment

included pneumonia, but no chronic lung diseases aside from "history of coal

workers' pneumoconiosis." JA659-660. He noted that he did not believe, based on

the chest x-ray from that date, that Thornton had enough fluid on his lungs to "tap

away." Id. The doctor ordered a CT and recommended a cardiac consultation, and

indicated that pulse oximetry, chest x-ray and pulmonary function tests were ordered

and performed that day. Id.

Thornton underwent a CT on May 9, 2012, and returned to Dr. Gallup on May

29, 2012 for a follow-up. JA932, JA935. The CT revealed a moderate to large right

pleural effusion[10] with partial right lung collapse and old granulomatous disease.[11]

---

[9] Thoracentesis is a procedure that a provider uses to drain extra fluid from around
the lungs (pleural space) with a needle. It's used to test the fluid for infection or other
illnesses and to relieve chest pressure that makes it tough to breathe. *See
https://my.clevelandclinic.org/health/treatments/24254-thoracentesis.*

[10] Pleural effusion, which some people call "water on the lungs," is the buildup of
excess fluid between the layers of the pleura outside your lungs. The pleura are thin
membranes that line your lungs and the inside of your chest cavity. Symptoms
include chest pain, dyspnea (shortness of breath) and orthopnea (difficulty breathing
while lying down). The most common causes of pleural effusion are heart failulre,
cirrhosis and nephrotic syndrome (a kidney issue). *See https://my.clevelandclinic.
org/health/diseases/17373-pleural-effusion.*

[11] Granulomas are small lumps of immune cells that form in your body in areas
where there is infection or inflammation. They're most commonly found in your
lungs, but they can also be in other areas of your head and body. Doctors believe
that they block the spread of organisms such as bacteria and fungi through your
body. *See https://www.webmd.com/lung/lung-granulomas.*

JA932. The note indicates Thornton had declined treatment for myeloma and was being seen by Dr. Powers for a cardiac evaluation. JA938. It was noted that his pleural effusion was possibly related to congestive heart failure. Id.

Thornton returned to his family doctor, Dr. Schaeffer, on July 11, 2012. JA941. The note indicates that Thornton was following up with a pulmonologist for pneumonia, which was clearing up. Id. He reported no shortness of breath or chest pain, and his oxygen saturation was 96% on room air. Id.

A CT administered at Forsyth Medical Center on January 20, 2013 revealed a large right pleural effusion and clear lungs. JA943.

Thornton was admitted to the emergency department at Novant Medical Center Forsyth on January 19, 2013, for complaints resulting from anemia and renal failure. JA947, JA949. He underwent CT-guided thoracentesis and a bone marrow biopsy. Id. The bone marrow biopsy revealed myelodysplastic syndrome.[12] Final diagnoses included febrile illness, neutropenia/pancytopenia,[13] pleural effusion,

---

[12.] Myelodysplastic syndrome (also called myelodysplasia or myelodysplastic neoplasm) refers to a group of cancers that keep your blood (hematopoietic) stem cells from maturing into healthy blood cells. Without enough healthy blood cells, you may develop serious conditions like anemia, frequent infections and bleeding that won't stop. Some people with MDS may develop acute myeloid leukemia (AML). MDS is rare. It affects about 4 in 100,000 people in the U.S. each year. *See https://my.clevelandclinic.org/health/diseases/6192-myelodysplastic-syndrome-myelodysplasia.*

[13.] Neutropenia refers to lower-than-normal levels of neutrophils in your blood. Not having enough neutrophils makes it harder for your body to fight germs and prevent infections. *See https://my.clevelandclinic.org/health/diseases/21058-neutropenia.*

diabetes mellitus, chronic atrial fibrillation, gouty arthropathy, dysphasia and obesity. JA948. The only breathing medication listed was a Symbicort inhaler. JA949.

Thornton saw Dr. Brodkin at Novant Health Oncology on February 1, 2013. JA955. It was noted that Dr. Thomas originally thought he suffered from multiple myeloma, but a recent bone marrow was consistent with myelodysplasia with trisomy 8. Id.

Dr. Renaldo of Forsyth Medical Group examined Thornton on February 8, 2013. JA959. The report indicates Thornton denied any breathing difficulties. JA960.

Thornton was admitted to the emergency department at Forsyth Medical Center on May 9, 2013, for shortness of breath, fever and cough, and he was treated for possible bronchitis.[14]JA965. The report for the first time mentions chronic obstructive pulmonary disease, noting Thornton's "chronic COPD is stable." Id.

Thornton was readmitted to Forsyth Medical Center on June 6 and June 17, 2013 for suspected viral pneumonia. JA969, JA971. During the admission on June

---

[14.] Bronchitis is when the airways leading to your lungs (trachea and bronchi) get inflamed and fill with mucus. You get a nagging cough as your body tries to get rid of the mucus. Your cough can last two or more weeks. Acute bronchitis is usually caused by a virus and goes away on its own. Chronic bronchitis never really goes away but can be managed. *See https://my.clevelandclinic.org/health/diseases/3993-bronchitis.*

6, 2013, he was noted to have a cough that was "not particularly productive." JA968. He was apparently not discharged until June 14, 2013, and was readmitted on the same complaints on June 17, 2013. JA971. The June 17 note states:

> This is an elderly gentleman who actually was fairly functional, but did notice for several years that he was slowly losing energy and felt that his diagnosis of myelodysplasia in January of this year had been an issue with him for quite some time.

JA974.

The note indicates that CT scans administered after the June 6 hospitalization revealed bilateral effusions. JA971. In the assessment section of the June 17 report, it was indicated that Thornton had bilateral effusions and it was felt his myelodysplastic syndrome was progressive. JA971. It further noted "significant dyspnea and acute respiratory failure. JA977. The July 3, 2013 discharge summary noted:

> [T]he patient is a 73-year-old married white male with a history of myelodysplasia. He also has a history of pleural effusions (right) requiring intermittent thoracenteses. He has been admitted on a number of occasions as well for fever associated with pulmonary infiltrates, and has always responded to antibiotic therapy. He has required intermittent transfusions that have become more frequent. He presented on the day of admission with fever and shortness of breath. CT of his chest showed bilateral infiltrates and effusions, and he was admitted for empiric antibiotic coverage and evaluation of the fluid. On admission, he was noted to have decreased breath sounds at both bases. He had 3+ edema in his lower extremities.

JA979. The final diagnoses included Myelodysplasia, recurrent anasarca/pleural effusions,[15] diabetes mellitus, hypertension, COPD, history of prostate cancer and mild renal insufficiency. JA980. With regard to Thornton's recurrent anasarca/pleural effusions, it was noted that consideration should be given to changing the antihypertensive medication he was taking. Id.

Thornton returned to Dr. Brodkin on December 5 and December 19, 2013. JA982, JA985. The December 5, 2013 note indicates Thornton was complaining of increases shortness of breath and underwent thoracentesis to remove fluid from off of his lungs. JA983. The December 19, 2013 note indicates Dr. Brodkin believed Thornton's myelodysplasia was slowly evolving into what looked like acute leukemia.[16] JA986.

A note from Dr. Brodkin dated January 23, 2014 indicated that Thornton's myelodysplasia was evolving into acute leukemia at a relatively rapid pace. JA989. He noted the miner's history of fluid overload, including right pleural effusion, and noted "I am not sure whether this is all cardiac in nature, but his most recent cardiac work-up suggests that his ejection fraction was reasonably well preserved. I am not

---

[15.] Anasarca is generalized edema (swelling). This is a severe buildup of fluid in the tissues of several parts of your body, like your face, belly, lungs and limbs. Anasarca happens when something throws off the balance of fluids moving between your blood vessels and the tissues around them. *See https://my.clevelandclinic.org /health/diseases/anasarca.*

[16.] Leukemia is a cancer of the blood, characterized by the rapid growth of abnormal blood cells. *See https://my.clevelandclinic.org/health/diseases/4365-leukemia.*

sure why he is developing anasarca. It could be related to his underlying bone marrow disorder." JA990. The doctor told Thornton that, without intervention, his leukemia would become more and more difficult to deal with. JA991.

Thornton returned to Dr. Brodkin on March 3, 2014. JA993. The doctor indicated that the etiology of Thornton's pleural effusions "remains uncertain." JA994. The list of diagnoses included COPD and "shingles April 2013." Id.

Thornton was seen for a cardiology consult at Forsyth Medical Center on March 14, 2014, at the request of Dr. Brodkin. JA997. The note is incomplete but indicates Thornton was complaining of shortness of breath and sharp right-sided chest pain with inhalation. Id.

Thornton passed away on March 21, 2014. JA563, JA575. The death certificate, completed by Dr. Brodkin, listed the cause of death as Myelodysplasia/Acute Myeloid Leukemia. JA671. No other causes were listed. Id.

Dr. K. R. Gallup prepared a short letter for the Department of Labor concerning Mr. Thornton on October 8, 2014. JA656. The letter answered unspecified questions concerning Thornton's medical treatment and referred to a May 8, 2012 office note. JA656, JA657. Dr. Gallup does not indicate, in either the letter or the note, an awareness of the title or the exertional requirements of Mr. Thornton's last coal mining job. Neither does the doctor state that Mr. Thornton was totally disabled from a respiratory or pulmonary standpoint. Instead, it appears the

doctor was asked to comment on whether Mr. Thornton suffered from coal workers' pneumoconiosis and whether pneumoconiosis caused Mr. Thornton's death.[17]

Dr. Gallup noted that "Mr. Thornton definitely suffered from a chronic pulmonary disease." JA656. Dr. Gallup wrote that this condition was causally related, at least in part, to inhalation of coal mine dust. Id. The physician broadly referenced pulmonary function studies and a CT scan from August 28, 2003 to support his opinion of a chronic pulmonary disease noting that his opinion was that coal mining employment played a part in causing the chronic pulmonary disease. Id. Dr. Gallup added that the coal mining employment resulted in "significant impairment;" he added Mr. Thornton stopped smoking in 1994 or 1995 yet he experienced decreased pulmonary function thereafter. Id. Dr. Gallup did not identify the chronic pulmonary disease from which Mr. Thornton suffered. Moreover, Dr. Gallup did not cite to any test data as supporting his opinion.

Dr. Gregory Fino reviewed Thornton's medical records and provided a medical report dated March 31, 2020. JA727. Dr. Fino reviewed the entire record and found no evidence of a chronic pulmonary condition and no evidence of a pulmonary impairment. JA732. The doctor found the May 8, 2012 pulmonary function study to be unreliable and attached medical journal articles supporting his

---

[17.] Dr. Gallup's letter is, "conclusional, and is the sort of thing treating physicians frequently write as an accommodation to their patients." *See Peabody Coal Co. v. Helms*, 901 F.2d 571, 574 (7th Cir. 1990).

opinion. JA719. Specifically, Dr. Fino opined study was invalid due to "a premature termination to exhalation and a lack of reproducibility in the expiratory tracings" and a "lack of an abrupt onset to exhalation." Id. The doctor concluded that Thornton's death was entirely explained by hematologic disease, acute myelogenous leukemia, and myelodysplasia. Id. Lastly, Dr. Fino noted he could rule out both coal mine dust and cigarette smoking as causing or contributing to Thornton's death. Id.

Dr. David Rosenberg provided a report and supplement on March 27, 2019 and April 23, 2020. JA649, JA790. Dr. Rosenberg initially reviewed the May 8, 2012 PFT and provided a report explaining why it was invalid. JA649. Dr. Rosenberg found the study was invalid because there was no repetitive testing performed to assess validity, and it was therefore impossible to assess whether there was a variance of more than 5% or 100cc, whichever is greater, based on the ATS [American Thoracic Society] criteria. JA649.

Lastly, in his April 23, 2020 report, Dr. Rosenberg reviewed Thornton's medical records and concluded his death was due to myelodysplasia with acute myeloid leukemia. JA796. Dr. Rosenberg noted he could rule out coal workers' pneumoconiosis and noted that Thornton's disability *as a whole person* was attributable to the myelodysplasia and leukemia. Id. Dr. Rosenberg found Thornton's death to be unrelated to coal workers' pneumoconiosis. JA798-799.

## IV.    SUMMARY OF ARGUMENT

Substantial evidence does not support the ALJ's finding that Claimant had proven disability based on the May 8, 2012 PFT and Dr. Gallup's medical opinion. In finding the May 8, 2012 PFT to be reliable, the ALJ relieved Claimant of her burden of proof, mischaracterized Drs. Fino's and Rosenberg's opinions and failed to review all relevant evidence. Specifically, the ALJ discredited the doctors' opinions because they failed to sufficiently explain why the May 8, 2012 PFT is unreliable. However, the ALJ failed to consider the medical journal articles Dr. Fino cited to and provided with his report. Dr. Rosenberg also cited to findings of the American Thoracic Societiy, which published several of the articles Dr. Fino provided, when finding the PFT invalid.

Lastly, the ALJ erred in discrediting Dr. Fino's and Rosenberg's opinions as unexplained when she credited Dr. Gallup's opinion as supporting a finding that the study was reliable, even though the doctor never commented on the reliability of the study.

The ALJ's consideration of Dr. Fino's and Dr. Rosenberg's opinions on the reliability of the May 8, 2012 pulmonary function study led her to discredit their medical opinions on the issue of total disability, which in turn led her to find that the pulmonary function study and medical opinion evidence supported a finding of total disability. The ALJ's decision to discredit Dr. Fino's and Dr. Rosenberg's opinions

on total disability led her to find Claimant entitled to benefit from the rebuttable presumption of death due to pneumoconiosis provided by 30 U.S.C. 921(c)(4). Finally, her decision to find the May 8, 2012 PFT to be reliable led her to discredit Dr. Fino and Dr. Rosenberg's opinions on the issues of pneumoconiosis and death causation.

Employer asks the court to vacate the ALJ's award of benefits and remand the claim to a different ALJ for a proper consideration of whether the pulmonary function study evidence, the medical opinion evidence, and the evidence as a whole supports a finding of total disability.

## V.   <u>ARGUMENT</u>

### A.   STANDARD OF REVIEW

The court's review of a decision awarding black lung benefits is "limited." *Harman Mining Co. v. DOWCP*, 678 F.3d 305, 310 (4th Cir. 2012) (citation omitted). The court evaluates the Board's legal conclusions de novo but defers to the ALJ's factual findings if supported by substantial evidence. *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 252 (4th Cir. 2016) (citation omitted). Substantial evidence is "more than a mere scintilla" and is "such relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).

That said, the court's deference to an ALJ's factual findings is not unlimited. "In determining whether substantial evidence supports the ALJ's factual determinations, [the court] must first address whether all of the relevant evidence has been analyzed[.]" *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998), (*citing Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439 (4th Cir. 1997)). When the Court finds that "an ALJ has incorrectly weighed the evidence or failed to account for relevant record evidence, deference is not warranted and remand is frequently required." *Addison*, 831 F.3d at 253.

And "as a condition to appellate review," under the APA, the ALJ has a duty to "adequately explain why he credited certain evidence and discredited other

evidence." Id. (citation omitted). Specifically, the APA requires that the ALJ include a statement of "findings and conclusions, and the reasons or basis therefor, on all material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A) as incorporated into the Act by 30 U.S.C. §932(a).

## B. THE ALJ'S FINDING THAT CLAIMANT ESTABLISHED TOTAL DISABILITY BY A PREPONDERANCE OF THE EVIDENCE IS NOT IN ACCORDANCE WITH THE LAW OR SUPPORTED BY SUBSTANTIAL EVIDENCE.

To obtain a survivor's award of black lung benefits under the Act, a claimant must prove, by a preponderance of the evidence,[18] that the miner: "(1) had pneumoconiosis; (2) the pneumoconiosis arose out of his coal mine employment; and (3) the miner's death was due to pneumoconiosis." *See* 20 C.F.R. § 718.205(a); 20 C.F.R. § 725.103; 20 C.F.R. § 725.212(a).

A miner is considered totally disabled if his pulmonary or respiratory impairment, standing alone, prevents him from performing his usual coal mine work or comparable gainful work.[19] *See* 20 C.F.R. §718.204(b)(1). In the absence of contrary probative evidence, a claimant may establish total disability based on

---

[18.] The claimant also retains the burden of proving total disability when determining whether he is entitled to benefits from the rebuttable presumption of death due to pneumoconiosis. *See* 20 C.F.R. § 718.305(b)(iii).

[19.] A claimant may also establish total disability by establishing that he suffers from the condition set forth in 20 C.F.R. 718.304, known as pulmonary massive fibrosis or "complicated" coal workers' pneumoconiosis. 20 C.F.R. § 718.204(b)(1). Claimant submitted no evidence of this condition. JA56.

pulmonary function study tests, arterial blood-gas-tests, evidence of pneumoconiosis and cor pulmonale with right-sided congestive heart failure, or by reasoned medical opinion relying upon medically acceptable clinical or laboratory diagnostic techniques. *See* 20 C.F.R § 718.204(b)(2)(i)-(iv).

The relevant inquiry is whether the miner is totally disabled, not whether he was disabled at some point in the past. *See Cooley v. Island Creek Coal Co.*, 845 F.2d 622, 624 (6th Cir. 1988). Pursuant to 20 C.F.R. § 718.204(a), benefits "are provided under the Act for or on behalf of miners who are totally disabled due to pneumoconiosis." The conditions of entitlement require a miner prove he "[i]s totally disabled." *See* 20 C.F.R § 725.202(d)(2)(iii). Lastly, the regulations state that entitlement ceases if the miner's total disability ceases and provide a mechanism for the termination of outstanding awards due to a change in the miner's condition. *See* 20 C.F.R § 725.203(a)(2); 20 C.F.R § 725.310.

## 1. THE ALJ'S DECISION TO CREDIT THE MAY 8, 2012 PULMONARY FUNCTION STUDY AS BEING RELIABLE AND SUPPORTIVE OF A FINDING OF TOTAL DISABILITY IS NOT IN ACCORDANCE WITH THE LAW OR SUPPORTED BY SUBSTANTIAL EVIDENCE.

The ALJ erred in finding Claimant established the reliability of the May 8, 2012 pulmonary function study. Title 20 C.F.R. § 718.101(b) provides, in pertinent part:

> The standards for the administration of clinical tests and examinations contained in this subpart shall apply to all

evidence developed by any party after January 19, 2001 in connection with a claim governed by this part….Any clinical test or examination subject to these standards shall be in substantial compliance with the applicable standard in order to constitute evidence of the fact for which it is proffered. Unless otherwise provided, any evidence which is not in substantial compliance with the applicable standard is insufficient to establish the fact for which it is proffered.

20 C.F.R. § 718.101(b).

Next, concerning *developed* versus *submitted* evidence, the comments to 20 C.F.R. § 718.103 state:

(d) One comment urges the Department to include a provision specifically exempting those medical tests and reports generated outside the black lung benefits claim context from the quality standards. Specifically, the commenter requests that the text of the regulation make clear that chest x-rays, pulmonary function tests and blood gas studies administered in the hospital or as part of the miner's routine care be exempted from quality standards applicability. The Department previously addressed this concern in the second notice of proposed rulemaking. 64 FR 54975 (Oct. 8, 1999). The Department noted that § 718.101 limits the applicability of the quality standards to evidence *"developed * * * in connection with a claim for benefits"* governed by 20 CFR parts 718, 725 or 727. Despite the inapplicability of the quality standards to certain categories of evidence, the adjudicator still must be persuaded that the evidence is reliable in order for it to form the basis for a finding of fact on an entitlement issue. Additional exclusionary language in the regulation is therefore unnecessary.

65 Fed. Reg. 79,928 (*emphasis added*). In its second notice of proposed rulemaking, the Secretary had noted:

(d) Two comments are concerned that the quality standards could result in the exclusion of a miner's hospitalization and/or medical treatment records, or a report of biopsy or autopsy. Section 718.101, however, makes the quality standards applicable only to evidence "developed * * * in connection with a claim for benefits" governed by 20 CFR Parts 725 and 727. Therefore, the quality standards are inapplicable to evidence, such as hospitalization reports or treatment records, that is not developed for the purpose of establishing, or defeating, entitlement to black lung benefits.

64 Fed Reg. 54,975 (Oct. 8, 1999).

With the above context in mind, 20 C.F.R. § 718.103, Pulmonary function tests, provides:

(a) *Any* report of pulmonary function tests *submitted* in connection with a claim for benefits shall record the results of flow versus volume (flow-volume loop). The instrument shall simultaneously provide records of volume versus time (spirometric tracing). The report shall provide the results of the forced expiratory volume in one second (FEV1) and the forced vital capacity (FVC). The report shall also provide the FEV1/FVC ratio, expressed as a percentage. If the maximum voluntary ventilation (MVV) is reported, the results of such test shall be obtained independently rather than calculated from the results of the FEV1.

(b) *All* pulmonary function test results *submitted* in connection with a claim for benefits shall be accompanied by three tracings of the flow versus volume and the electronically derived volume versus time tracings. If the MVV is reported, two tracings of the MVV whose values are within 10% of each other shall be sufficient. Pulmonary function test results *developed* in connection with a claim for benefits *shall also include* a statement

signed by the physician or technician conducting the test setting forth the following:

(1) Date and time of test;
(2) Name, DOL claim number, age, height, and weight of claimant at the time of the test;
(3) Name of technician;
(4) Name and signature of physician supervising the test;
(5) Claimant's ability to understand the instructions, ability to follow directions and degree of cooperation in performing the tests. If the claimant is unable to complete the test, the person executing the report shall set forth the reasons for such failure;
(6) Paper speed of the instrument used;
(7) Name of the instrument used;
(8) Whether a bronchodilator was administered. If a bronchodilator is administered, the physician's report must detail values obtained both before and after administration of the bronchodilator and explain the significance of the results obtained; and
(9) That the requirements of paragraphs (b) and (c) of this section have been complied with.

(c) Except as provided in this paragraph, no results of a pulmonary function study shall constitute evidence of the presence or absence of a respiratory or pulmonary impairment unless it is conducted and reported in accordance with the requirements of this section and Appendix B to this part. In the absence of evidence to the contrary, compliance with the requirements of Appendix B shall be presumed. *In the case of a deceased miner, where no pulmonary function tests are in substantial compliance with paragraphs (a) and (b) and Appendix B, noncomplying tests may form the basis for a finding if, in the opinion of the adjudication officer, the tests demonstrate technically valid results obtained with good cooperation of the miner.*

20 C.F.R. § 718.103 (*emphasis added*).

Lastly Appendix B to Part 718 (1) outlines the requirements for the equipment used to administer pulmonary function testing, whereas subparagraph (2) provides guidance for administering and interpreting test results. Subparagraph (2)(ii)(G) addresses unacceptable variation between the three spirometric curves, but Appendix B does not address the base requirement set forth in 20 C.F.R. § 718.103(a) that all PFTs include three tracings.

Thus, 20 C.F.R. § 718.103(a) and the first two sentences of subsection (b) set forth the criteria that *all* pulmonary function studies submitted in connection with a claim must satisfy, whether administered pursuant to the miner's regular treatment or developed in connection with a claim. The latter part of 718.103(b), beginning with sentence three, further provides nine additional criteria ("the quality standards") that pulmonary function studies *developed* in connection with a claim must satisfy. Lastly, in those claims where the miner is deceased and the record includes no studies are in substantial compliance with paragraphs (a) and (b) and Appendix B, noncomplying tests may form the basis for a finding if the ALJ finds the tests demonstrate technically valid results obtained with good cooperation of the miner.

In this case, the ALJ considered three pulmonary function studies. She gave no weight to the December 19, 1995 and September 16, 2003 pulmonary function studies due to their age. The third study, administered on May 8, 2012, included a single flow volume loop/tracing and included no comments as to the miner's

cooperation.[20] The ALJ found the study reliable because Dr. Gallup referred to the study in his May 8, 2012 report. She further discredited Dr. Fino's and Dr. Rosenberg's opinions that the study was unreliable, based on her finding that the doctors had improperly based their opinions on the quality standards, and because they were not well reasoned.

Next, when considering the medical opinion evidence, the ALJ credited Dr. Gallup's opinion that the miner suffered from a "significant impairment" as a finding of total disability. The ALJ again discredited Dr. Fino's opinion that the miner was not disabled from a respiratory or pulmonary standpoint because it was based on his finding that the May 8, 2012 PFT was unreliable, which was contrary to her finding.

First, the ALJ erred by relieving Claimant of her burden of proving the reliability of the May 8, 2012 PFT and, relatedly, in holding Employer's physicians to a higher standard when considering this issue. Specifically, the ALJ discredited Dr. Fino's and Rosenberg's opinion's that the PFT was invalid on the grounds that their opinions were unexplained, but credited Dr. Gallup's opinion as supporting the reliability of the study when Dr. Gallup never commented on the reliability of the study.

---

[20.] As noted above, the May 8, 2012 PFT is technically non-qualifying. 20 C.F.R. § 718.204(b)(2)(i)(A)-(C).

Next, the ALJ erred in discrediting Employer's physician's opinions because they were based in part upon the "quality standards." A review of the regulations and the relevant comments set forth in the preamble note that the requirement that a pulmonary function study include three tracings is not included in the "quality standards."

Next, the ALJ further erred in finding Dr. Fino's and Dr. Rosenberg's opinions that the May 8, 2012 PFT is unreliable to be unexplained. When assessing the doctors' opinions, the ALJ failed to consider the medical journal articles cited to and provided by Dr. Fino which support both doctors' opinions.

Lastly, the ALJ's error is not harmless. Had the ALJ found the May 8, 2012 PFT to be unreliable, she would have had to reconsider her finding that the pulmonary function study evidence proved total disability pursuant to 20 C.F.R. § 718.204(b)(2)(i). Such a finding would also require her to reconsider her decision to discredit Dr. Fino and Rosenberg's medical opinions on the issue of total disability, and her finding that the medical opinion evidence proved total disability pursuant to 20 C.F.R. § 718.204(b)(2)(i). Finally, vacating the ALJ's finding that Claimant established total disability would also require the court to vacate her finding that the rebuttable presumption of death causation found at 30 U.S.C. § 921(c)(4) applied.

### a. The ALJ discredited Dr. Fino and Dr. Rosenberg's opinions as to the reliability of the May 8, 2012 pulmonary function study for improper reasons.

The ALJ discredited Dr. Fino and Dr. Rosenberg's opinions as to the reliability of the May 8, 2012 pulmonary function study for improper reasons. When rejecting Dr. Fino's and Dr. Rosenberg's opinions, the ALJ noted:

> Drs. Fino and Rosenberg also offered opinions as to the validity of the May 8, 2012 pulmonary function testing. In a March 27, 2019 letter, Dr. Rosenberg reviewed the pulmonary function test and stated that because repetitive testing was not done to assess variability, as directed by Appendix B to part 718, the test was invalid. Similarly, in his April 23, 2020 medical records review, Dr. Rosenberg stated:
>
> > Mr. Thornton did have reduced lung volumes measured in 2012, but these pulmonary functions could not be verified. They were associated with no repetitive testing to assess variability and thus determine validity. Both the D.O.L. and the ATS [American Thoracic Society] require variability data to assure pulmonary function tests are valid. Such data was not available with respect to Mr. Thornton's 2012 studies.
>
> (EX-4 at 6)[JA796].
>
> In his review of records, dated March 31, 2020, Dr. Fino stated:
>
> > The spirometry was invalid because of a premature termination to exhalation and a lack of reproducibility in the expiratory tracings. There is also a lack of an abrupt onset to exhalation. The values recorded for this spirometry represent at least the minimal lung function that this individual could

30

perform and certainly not this individual's maximum lung function.

(EX-3 at 3)[JA729]. He also stated that he felt the results were due to poor effort. Id. at 4 [JA730].

To the extent that both Dr. Rosenberg and Dr. Fino classified the May 8, 2012 pulmonary function test as invalid simply because repetitive testing, or three trials, were not completed in accordance with 20 C.F.R. § 718.103 and Appendix B, their opinions are not well reasoned, not well documented, and given little weight. The applicable regulations state very specifically that "[t]he standards for the administration of clinical tests and examinations contained in this subpart shall apply to all evidence developed by any party . . . in connection with a claim governed by this part." 20 C.F.R. § 718.101(b). Therefore, the quality standards are inapplicable where, as here, the pulmonary function test was contained within treatment notes and not developed in connection with the claim. This is further supported by 20 C.F.R. § 718.103(c), quoted above, which states that in cases of deceased miners, the quality standards do not apply if the tests demonstrate technically valid results obtained with good cooperation of the miner. To the extent that Drs. Rosenberg and Fino based their conclusion that the May 8, 2012 pulmonary function test was invalid on the fact that it did not involve repetitive testing, their opinions are not well-reasoned, not well documented, and given little weight. To be given more weight, they would have needed further explanation as to why specifically the lack of repetitive testing rendered the test invalid or caused there to be question about the Miner's cooperation.

JA44-JA45.

Thus, the ALJ criticized Drs. Fino and Rosenberg because they based their opinions in part upon the study's failure to comply with the "quality standards," because they failed to explain the lack of repetitive testing rendered the test invalid.

As an initial matter, the requirement that each pulmonary function study include three tracings is not included in the "quality standards" that are inapplicable to treatment notes.[21] As noted above, the requirement that each study include three tracings is found in the first sentence of 20 C.F.R. § 718.103(b), and the "quality standards" do not begin until the third sentence of § 718.103(b).

More importantly, however, the ALJ failed to quote Dr. Fino in full. Dr. Fino actually noted when finding the PFT invalid:

> The spirometry was invalid because of a premature termination to exhalation and a lack of reproducibility in the expiratory tracings. There is also a lack of an abrupt onset to exhalation. The values recorded for this spirometry represent at least the minimal lung function that this individual could perform and certainly not this individual's maximum lung function.

---

[21.] Employer acknowledges that the ALJ in this case would still be permitted to credit a test that does not meet the requirements of paragraph (a) of 20 C.F.R. § 718.103 if she finds the test to be reliable. Employer instead takes issue with the ALJ's referral to the requirements set forth in paragraph (a) and the first two sentences of paragraph (b) as constituting the "quality standards." As noted above, the "quality standards" do not begin until the third sentence of paragraph (b). The ALJ's and Board's imprecise use of terminology in this case could lead to the improper crediting of studies found in treatment notes that do not meet the requirements set forth in paragraph (a) and the first two sentences of paragraph (b) in cases that do not involve a deceased miner.

References: (1) Standardization of Spirometry. A.R.R.D. 1987; 136:1285-1298. (2) ATS Statement-Snowbird Workshop on Standardization of Spirometry. A.R.R.D. 1979; 119:831-838. (3) Statement on Spirometry. *Chest* 1983; 83:547-550. (4) ATS/ERS Task Force: Standardization of Lung Function Testing – Standardization of Spirometry. Eur Respir J 2005; 26: 319-338. (5) Appendix B to Part 718-stndards for Administration and Interpretation of Pulmonary Function Tests. Tables B1, B2, B3, B4, B5, B6. (from 20 CFR Part 718 et al. Regulations Implementing the Federal Coal Mine Health and Safety Act of d1969, as Amended; Final Rule). *Federal Register*, December 20, 2000; 65 [No. 245]: 80052-80053.

JA 723.

Thus, the ALJ failed to address the four medical journal articles Dr. Fino also

cited to and attached to his report. JA745-789. Those articles note the following:

**ATS/ERS Task Force: Standardization of Lung Function Testing – Standardization of Spirometry. Eur Respir J 2005; 26: 319-338.**

**Interpretative Strategies for Lung function tests**

….

An interpretation begins with a review and comment on test quality. Tests that are less than optimal may still contain useful information, but interpreters should identify the problems and the direction and magnitude of the potential errors. Omitting the quality review and relying only on numerical results for clinical decision making is a common mistake, which is more easily made by those who are dependent upon computer interpretations.

JA771-772.

**Standardization of Spirometry. A.R.R.D. 1987; 136:1285-1298.**

**American Thoracic Society - Standardization of Spirometry: 1987 Update.**

….

## VI. Maneuver Performance Recommendation

….

**Recommendation-FVC Subject Instruction and Maneuver**

Subjects will be instructed in the FVC maneuver and the appropriate technique will be demonstrated. *A MINIMUM* of 3 acceptable FVC maneuvers will be performed. If a subject has large variability between expiratory maneuvers, reproducibility criteria may require that up to 8 acceptable maneuvers be performed.

….

**Recommendation- Minimum FVC Exhalation Time**

A minimum exhalation time of 6 s, unless there is an obvious plateau, is required to obtain maximal FVC results. Longer times are often required to achieve "end of test," particularly in obstructed individuals.

….

## VI. MEASUREMENT PROCEDURES

**Measurements**

Spirometric variables should be measured from a series of *AT LEAST* 3 acceptable forced expiratory curves.
*Rationale.* Best efforts cannot always be determined by simple inspection of a spirogram. Measurements and calculation are required to determine the largest values.

….

## VII. Acceptibility and Reproducibility

**Recommendation-FVC Test Result Reproducibility**
As a goal during test result performance, the largest FVC and second largest FVC from acceptable curves should not vary by more than 5 % of reading (expressed as a percentage of the largest observed FVC regardless of the curve on which it occurred) or 0.100 L, whichever is greater. In addition to the FVC criteria, the largest $FEV_1$ and the second largest $FEV_1$ (expressed as a percentage of the largest observed $FEV_1$ regardless of the curve on which it occurred) should not vary by more than 5% of reading or 0.100 L, whichever is greater.

The reproducibility criteria are used as a guide to whether more than 3 FVC maneuvers are needed; these criteria are *NOT* to be used for excluding results from reports or for excluding subjects from a study. Labelling results as being derived from data that do not conform to the reproducibility criteria stated above is encouraged (especially when the data suggests that bronchospasm was triggered by the FVC maneuver). The acceptability criteria should be applied before the reproducibility criteria (see figure 3). Unacceptable maneuvers should be discarded before applying the reproducibility criteria.

JA749-751.

**ATS Statement-Snowbird Workshop on Standardization of Spirometry. A.R.R.D. 1979; 119:831-838.**

**ATS statement -- Snowbird workshop on standardization of spirometry.**

**....**

*Standard Methods for Test Performance*

Subjects will be instructed in the FVC maneuver, and the appropriate technique will be demonstrated. A minimum of 3 acceptable FVC maneuvers will be performed. Acceptability will be determined by the technician's observation that the subject understood the instructions and performed the test with a smooth continuous exhalation, with apparent maximal effort, with a good start, and without *(1)* Coughing. *(2)* Val-salva maneuver (glottis closure). *(3)* Early termination of expiration. (In a normal patient this would be before completion of the breath; in an obstructed patient this would be assumed to have taken place if the expiratory time was less than 5 sec.) *(4)* A leak. *(5)* An obstructed mouthpiece (obstruction due to the tongue being placed in front of the mouthpiece, false teeth falling in front of the mouthpiece, etc.). *(6)* An unsatisfactory start of expiration, characterized by excessive hesitation or false starts. Unsatisfactory starts prevent accurate back extrapolation and determination of time zero. To achieve accurate time zero the extrapolated volume on the volume time tracing spirogram – should be less than 10 per cent of the FVC or 100 ml whichever is greater. (*See figure 1 for definition of extrapolated volume*). *(7)* An excessive variability among the 3 acceptable curves. The 2 best of the 3 acceptable curves should not vary by more than $\pm$ 5 per cent of reading or $\pm$ 100 ml, whichever is greater.

*Rationale*

At least 3 acceptable tests are required to ensure that maximal effort and cooperation are obtained and that the tests provide an accurate reflection of the subject's pulmonary function. This conclusion was achieved after reviewing the data of Knudson and associates. (Appendix B. table 1) [unintelligible] and others. (7, 21). There is no need to obtain more than 3 acceptable tests.

JA759, JA764-765.

**Statement on Spirometry.** *Chest* **1983; 83:547-550.**

**American College of Chest Physicians scientific section recommendations - Statement on Spirometry**

….

The forced vital capacity (FVC) maneuver is the basic spirometric maneuver for the evaluation of the mechanics of breathing. The maneuver entails a maximum inspiration to total lung capacity followed by a maximum forced exhalation to residual volume. Patients must be carefully instructed, by well-trained technicians, in this somewhat artificial maneuver; practice attempts are frequently required before acceptable spirograms are obtained. The elements of an acceptable FVC maneuver include: (1) full inspiration to total lung capacity before forced expiration begins: (2) the beginning of forced expiration should be abrupt, without hesitation; (3) maximum effort must be exerted throughout expiration; (4) spirograms during which interruptions are observed due to coughing, glottis closure, obstruction by the tongue or false teeth should be discarded (the contour of the volume-time tracing should be smooth and without interruption); (5) in general, an FVC maneuver that takes less than four seconds should be discarded; the maximum expiration should continue until an obvious "plateau" appears on the volume-time tracing, and the volume change per 0.5 second interval is 25 ml or less. A permanent record of the spirographic curve is important for evaluation of its acceptability.

It is generally agreed that three forced expiratory tracings that meet the above criteria constitute an acceptable test. Acceptability is contingent on reproducibility of the FVC and forced expiratory volume a ] second ($FEV_1$) among the curves. The two best of three acceptable spirograms should not vary by more than 5 percent of the largest value or by more than 100 ml, whichever is greater. Adherence to such standards will ensure that the values reported represent maximum effort and reflect actual pulmonary

> function. If the steepest slope of the spirogram does not occur at the onset of the curve, a back extrapolation technique—in which the steepest slope of the curve is extrapolated to maximum inspired volume (zero point) and the $FEV_1$ measured from that point – should be used. The details of this extrapolation technique have been published by Smith and Gaensler.

JA767.

Dr. Fino stated that the May 8, 2012 pulmonary function study was unreliable because of a premature termination to exhalation and a lack of reproducibility in the expiratory tracing. JA729. The cited (and provided) journal articles state that these factors are necessary for ensuring the reliability of test results, and note that simply relying on the obtained numerical values is a "common mistake" made by practitioners. JA749-750, JA750, JA751, JA764-765, JA769, JA771-772. The ALJ did not even acknowledge the articles, let alone assess them to determine whether they supported Dr. Fino's position.

Similarly, Dr. Rosenberg also based his opinion that the study was invalid on the lack of three tracings, and he cited to the American Thoracic Society as supporting his opinion. JA649. The articles attached to Dr. Fino's report include articles from the American Thoracic Society which confirms that three studies are necessary to confirm that maximal effort was given.

The court should vacate the ALJ's decision to reject Dr. Fino's and Dr. Rosenberg's opinions on the grounds they are unexplained and remand for further

consideration of whether Claimant has met his burden of proving the reliability of the May 8, 2012 PFT.

Next, the ALJ further discredited Dr. Fino's opinion because he failed to explain how he determined Thornton had prematurely terminated exhalation:

> To support his opinion that the May 8, 2012 pulmonary function test was invalid, Dr. Fino also referenced premature termination to exhalation and a lack of an abrupt onset to exhalation. These two issues again reference requirements from Appendix B of Part 718 that are not applicable to the test at issue, as discussed more fully above. Furthermore, Dr. Fino did not explain how he reached these conclusions regarding the timing of the Miner's exhalation during the test. An examination of the volume/time tracing from the test shows that the Miner exhaled for over seven seconds, which is consistent with Appendix B. Regarding the "lack of an abrupt onset to exhalation," Dr. Fino failed to explain how he arrived at this conclusion or why it affected the validity of the test. His opinion on this point is both poorly documented and poorly reasoned and given no weight.

JA44-45.

Here, the volume-time graph included with the May 8, 2012 study, which the ALJ cited as showing the miner blew for seven seconds, shows the *volume* of air ceased to increase, or "plateaued," around two seconds into testing. JA662. This is readily apparent from a simple review of the study itself. However, even if the court were to find substantial evidence to support the ALJ's decision to discredit Dr. Fino's opinion on these grounds, the fact that the study included only one tracing, as

opposed to three, is an independent grounds on which to vacate and remand the ALJ's finding.

The Board affirmed the ALJ's finding, noting Employer was simply asking the Board to reweigh the evidence. JA8. However, when the Court finds that "an ALJ has incorrectly weighed the evidence or failed to account for relevant record evidence, deference is not warranted and remand is frequently required." *Addison*, 831 F.3d at 253.

### b. Substantial evidence does not support the ALJ's decision to credit Dr. Gallup's opinion as supporting the reliability of the May 8, 2012 PFT.

The ALJ relieved Claimant of her burden of proving the reliability of the May 8, 2012 PFT. The PFT did not include comments from the administering technician describing the miner's comprehension and cooperation while undergoing the study, nor did Dr. Gallup address its reliability in his letter. JA656-657, JA662. The ALJ found the study reliable simply because Dr. Gallup cited it in his letter. JA45. However, the medical journal articles cited and provided by Dr. Fino specifically stated that a "common error" committed by practitioners was relying on the values produced by a study without assessing the studies reliability. JA771-772. Thus, there is no reason to interpret Dr. Gallup's simple citation of the PFT as proof of its reliability. Without further comment from Dr. Gallup, there was no way for the ALJ to know whether Dr. Gallup was one of the practitioners who

committed the "common error" of accepting the numerical results of the study at face value.

Thus, if the court vacates the ALJ's decision to discredit Dr. Fino's and Dr. Rosenberg's opinions as to the reliability of the May 8, 2012 PFT, it should also vacate its decision to credit Dr. Gallup's opinion as supporting a finding that the May 8, 2012 PFT is unreliable.

## 2. THE ALJ'S DECISION TO CREDIT THE MEDICAL OPINION EVIDENCE AS SUPPORTING A FIDNING OF TOTAL DISABILITY IS NOT IN ACCORDANCE WITH THE LAW OR SUPPORTED BY SUBSTANTIAL EVIDENCE.

The ALJ credited Dr. Gallup's opinion over Dr. Fino's and Rosenberg's when finding the medical opinion evidence supported a finding of total disability. JA46. The ALJ's decision to discredit Drs. Fino and Rosenberg's opinion was again based primarily upon her finding that the May 8, 2012 PFT was reliable:

> Taking these factors into account, Dr. Gallup's opinion is entitled to controlling weight, particularly when weighed against the unpersuasive opinions of Drs. Fino and Rosenberg, who did not examine the Miner and rejected the results of the May 8, 2012 pulmonary function test, which the court has found to be valid.

Id.[22]

---

[22.] The Board affirmed the ALJ's decision to discredit Dr. Fino's and Dr. Rosenberg's opinions based on their disagreement with the ALJ's finding that the May 8, 2012 PFT was reliable alone. JA9. It did not consider Employer's challenge to the ALJ's decision to discredit the doctors' opinions on the grounds the failed to consider that Thornton was prescribed oxygen nine months prior to his death. JA10.

If the court vacates the ALJ's finding that the May 8, 2012 PFT is reliable, it must also vacate the ALJ's finding that the medical opinion evidence supports a finding of total disability. Even if the ALJ were to credit Dr. Gallup's opinion on remand, the ALJ may also credit Dr. Fino's and Rosenberg's opinions and find the medical opinion evidence to be in equipoise on this issue, which is insufficient to meet Claimant's burden of proof.

**C.  THE ALJ's FINDING THAT CLAIMANT ESTABLISHED ENTITLEMENT TO THE REBUTTABLE PRESUMPSIONS OF PNEUMOCONIOSIS AND DEATH CAUSATION IS NOT IN ACCORDANCE WITH THE LAW OR SUPPORTED BY SUBSTANTIAL EVIDENCE.**

For claims filed after January 1, 2005, and still pending on or after March 23, 2010, a miner is presumed to have died due to coal workers' pneumoconiosis if the claimant establishes fifteen years of qualifying coal mine employment and a totally disabling respiratory impairment. 30 U.S.C. §921(c)(4); 20 C.F.R. §718.305.   In order to rebut the presumption, an employer must affirmatively prove both that Claimant does not have legal pneumoconiosis and clinical pneumoconiosis,[23] or establish that "no part of claimant's disabling respiratory or pulmonary impairment

---

[23.] An employer may rebut the presumption of legal pneumoconiosis under the rebuttal method set forth in § 718.305(d)(2)(i) by proving that the miner's lung disease was not "'significantly related to, or substantially aggravated by,' the fifteen years or more he has spent in coal mines." *See West Virginia CWP Fund v. Smith*, 880 F.3d 691, 697 (4th Cir. 2018).

was caused by pneumoconiosis, as defined in § 718.201." 20 C.F.R. §718.305(d)(1); *West Virginia CWP Fund v. Bender*, 782 F.3d 129, 137 (4th Cir. 2015).

The ALJ's finding that the presumption applied was dependent upon her finding that Claimant established Thornton was totally disabled from a respiratory or pulmonary impairment. The ALJ's finding that the miner was totally disabled was in turn dependent on her finding that the May 8, 2012 PFT was reliable. This finding led her to credit the medical opinion of Dr. Gallup and discredit the medical opinions of Drs. Fino and Rosenberg on the issue of total disability, as well as her decision to find the evidence as a whole supported a finding of total disability. Thus, a finding by the court that the ALJ erred in finding the May 8, 2012 PFT to be reliable and supportive of a finding of total disability must also result in the vacating of the ALJ's finding that Employer failed to rebut the presumptions of pneumoconiosis and death causation. *See Island Creek Coal Co. v. Blankenship*, ___ F.4th ___, 2024 WL 5131109, p. 17, f.n. 7 (4th Cir. 2024)(Because we find that the ALJ erred in applying the total disability inquiry, the ALJ necessarily erred in applying the fifteen-year presumption based on his finding of total disability).

## VI.   <u>CONCLUSION</u>

The Court should vacate the ALJ's award and remand the claim to a different ALJ for further consideration of whether Claimant established total disability by a preponderance of the evidence. The ALJ erred in finding the pulmonary function study and medical opinion evidence preponderated to establish total disability and in finding Claimant was entitled to benefit from the 15-year presumption of death due to pneumoconiosis.

Respectfully submitted,

ITMANN COAL CO.,

By Counsel

PENN, STUART & ESKRIDGE
804 Anderson Street
Bristol, Tennessee 37620
Phone: 423-516-7036
Fax: 423-282-3081
E-Mail:jsigmond@pennstuart.com

By:      _/s/ John Sigmond_
         JOHN SIGMOND
         Counsel for Petitioners
         VSB No.: 68658

## VII.   <u>REQUEST FOR FORMAL ARGUMENT</u>

The Petitioner, Itmann Coal Co., pursuant to FRAP 34 and Local Rule 34(a), requests that the Court hear oral argument in this matter.  Petitioner believes it has presented the Court with a genuine dispute ripe for adjudication.  The issue in dispute is not unique to this case and will have a wide impact.  Oral argument will give all the petitioners the opportunity to fully articulate the importance of the issues at bar.

## VIII.  CERTIFICATE OF COMPLIANCE

In accordance with Rule 32(a) of the Federal Rules of Appellate Procedure and the Local Rules of the Fourth Circuit Court of Appeals, I hereby certify that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains no more than 13,000 words. According to the word-processing system used to prepare this brief, Microsoft Word, it contains 10,396 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface with serifs using Microsoft Word, Times New Roman, 14-point font.

(s) *John Sigmond*

Attorney for Itmann Coal Co.

Dated: January 6th 2025

## IX.  <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of November, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

<u>/s/ John Sigmond</u>
John Sigmond, Esq.